Laura Le Couteulx De Caumont, Respondent, *v.* Antonio Rasines, Appellant.

*Principal and surety — when a creditor must first resort to the property of the principal debtor.*

To sustain the defense that a creditor, as between a surety and the principal debtor, must first resort to the property of the principal debtor, two things are necessary — a request by the surety to the creditor so to proceed, and a failure to comply therewith with resultant damages.

An accommodation maker of a note, payable "on demand and return of the securities given," and delivered under no agreement as to the use to be made of it, is not entitled to insist that the note shall be used as an offset to an obligation existing in favor of the principal maker against the holder of the note, who took the note with knowledge of the relation thereto of the accommodation maker — the obligation not being a collateral to secure the payment of the note.

Appeal by the defendant, Antonio Rasines, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 3d day of December, 1898, upon the verdict of a jury rendered by direction of the court.

The action was brought upon four promissory notes, each forming a separate cause of action, each payable to the order of Charles W. Dayton, attorney, and signed by J. S. McWilliam, since deceased, and Antonio Rasines, the defendant, and each having express collaterals.

FIRST DEPARTMENT, MARCH TERM, 1899.          [Vol. 38.

The answer admits the making of the notes and delivery for value, but denies the plaintiff's title, alleges payment and sets up a counterclaim arising upon dealings between the parties. When the plaintiff had rested, the defendant's attorney, Mr. Hill, was permitted to state the facts relied upon as defense, which he did as follows:

" Prior to the making of the notes, and in July, 1890, Mr. Dayton, then being the attorney in fact for the plaintiff, bought from a Mr. Meyer a piece, or several pieces of property on Broadway, and at the same time gave a declaration of trust to Mr. John S. McWilliam for a quarter interest in that property, this declaration being in consideration of services rendered and to be rendered, no money being then paid. There was a provision in the declaration that Mr. McWilliam should contribute proportionately to the expenses of carrying the property. Later Mr. McWilliam received from Mr. Dayton another declaration of trust for one-sixteenth interest in the property in consideration of $12,500 cash, thus making five-sixteenths interest in the property, with a like provision about the contribution for the expenses of carrying. Those papers contemplated that there should not be a conveyance to Mr. McWilliam of any interest in the real estate itself, but that the property should be carried in Mr. Dayton's name and ultimately be sold and the proceeds divided among the parties interested, Mr. McWilliam to receive his share upon that basis.

" While matters stood in this shape Mr. McWilliam desired to obtain a loan of money from Mr. Dayton or to have him raise some money for him, and applied to him for that purpose. The result was that an arrangement was made between Mr. Dayton, Mr. John S. McWilliam and Mr. Rasines, the defendant, that Mr. Dayton should loan Mr. McWilliam some money with which to buy certain Canal street bank stock or something of that kind, upon specified collateral, to wit, the bank stock which he was going to buy, and also upon the name of Mr. Rasines signed as co-maker with him upon the notes, it being understood by them all that Mr. Rasines had no interest at all in the loan or proposed purchase, but was to sign the notes solely as an accommodation maker.

" I do not expect to prove that there was a definite contract between Mr. Dayton and either of the makers of those notes that this real estate interest was a collateral to the obligation itself. My

position is that, while they stood in that relation to each other, that real estate interest was an existing resource which Mr. Dayton had the right to use, and in equity was bound to use for the protection of the surety.

"Later relations were changed between the plaintiff and Mr. Dayton. Mr. Stier became the plaintiff's attorney and agent, he knowing all about the original transaction and the relations of the parties to it. Then the notes were transferred, as the complaint states, for value, that is to say, the promise on the notes was not originally to Mrs. De Caumont, the plaintiff, through Mr. Dayton as her attorney. They were not her notes, to begin with, except, perhaps, in equity. The notes were transferred to her, as this complaint states, for value, and the real estate interest of Mr. McWilliam, as well as those of Mr. Dayton, were transferred to Mr. Stier, who held them for the plaintiff. Mr. McWilliam died in March, 1893.

"Inasmuch as I am making this statement as the basis, perhaps, of a motion, I should also state another fact. Mr. Stier, for the plaintiff, took this real estate under peculiar circumstances. He knew of these outstanding equities in favor of Mr. McWilliam and some from other people who were interested in it; and before taking title he insisted that there should be quitclaim deeds or releases from these beneficiaries so as to confirm an absolute title in Mr. Dayton, and then he would take the property. The McWilliam executors, therefore, at the request of Mr. Dayton, gave him a quitclaim deed releasing this McWilliam interest to him, Mr. Dayton, for the express purpose of enabling Mr. Dayton to convey the property to Mr. Stier. Mr. Stier, on the other hand, promised Mr. Dayton, in a written obligation, that when he sold this property he would pay him, Dayton, $25,531.94, which sum was settled upon as the amount which Mr. McWilliam had put into the property. The McWilliam executors gave the quitclaims to Mr. Dayton, and Mr. Dayton gave deeds to Mr. Stier for the plaintiff. Mr. Stier gave back to Mr. Dayton a written obligation such as I have named, and Mr. Dayton then assigned that obligation of Mr. Stier over to the McWilliam executors as collateral security for the payment of the $25,531.94, and at the same time paid them down $10,000 in cash.

"Some fifteen to eighteen months later Mr. Stier sold this Broad-

FIRST DEPARTMENT, MARCH TERM, 1899.          [Vol. 38.

way property, still holding these notes, and realized thereon a large sum of money, very much in excess of the amount of the McWilliam interest therein, so that but for the deeds, what would have been the McWilliam interest was very much in excess of the amount of these notes, even plus the $25,531.94 which he had agreed to pay. Then Mr. Stier paid over —

" THE COURT.— That is, it was upwards of $40,000 ?

" Mr. HILL.— Yes, I think it was considerably over $50,000. Mr. Stier then paid to the McWilliam executors the balance which was due to them, that is to say, the original McWilliam interest in the properties was estimated, I think, in exact figures at $25,531.94 ; and Mr. Dayton had paid them against, or advanced to them against, his obligation, $10,000 in cash, thus leaving $15,531.94 yet to be paid. That sum, together with the interest, making $16,000 and some odd, was paid by Mr. Stier directly to the executors instead of applying any of it upon these notes.

" There is one other fact which I ought in frankness to disclose. Of course, it should be said, Mr. Rasines at the time of making the notes, did not know that Mr. Dayton held this real estate interest, nor did he learn that there was any such resource either in favor of Mr. Dayton or afterwards in favor of Mr. Stier for the plaintiff or for the plaintiff herself, until the money was paid over on the sale of the property by Mr. Stier.

" In the meantime Mr. Rasines paid to Mr. Stier some $3,900 of the principal and kept up the interest to November 1st, 1896. Then, after that, he paid the sum mentioned in the answer in that behalf, some $1,012.50 for interest, and, at the request of Mr. Stier, also assigned the policy of life insurance as further collateral, but all in ignorance of the fact that this money had been received or that there was any such arrangement. Subsequently he learned of that arrangement. He then claimed that the notes were in reality satisfied, and that he was discharged, or, at all events, that he had this equitable defense. He, therefore, declined to pay any further.

" Your honor also notices that there is a separate defense there of payment.

" THE COURT.— I understand, but that separate defense of payment, I presume, depends, of course, upon this state of facts, that if there was payment it was payment by reason of the sale.

"Mr. HILL.— Setting off cross demands against each other and extinguishing the notes.

"THE COURT.— Yes, of course, depending upon this.

"Mr. HILL.— Mr. Stier has not yet paid over the $10,000 which Mr. Dayton advanced.

"THE COURT.— Yes, now, I think, we have something substantial on which the question of law can be raised.

"Mr. HILL.— I ought to have stated that the McWilliam estate is insolvent, as a part of my opening. There is the evidence, that it was insolvent from the beginning."

The plaintiff moved that the court should hold that these facts stated no defense, and that a verdict be directed for the plaintiff, which motion the defendant opposed.

After argument the court directed a verdict for the plaintiff in the sum of $15,120.38, and defendant duly excepted.

*John L. Hill,* for the appellant.

*Joseph F. Stier,* for the respondent.

O'BRIEN, J. :

The collaterals mentioned in the notes did not include the real estate, part of the proceeds of which when realized went to discharge the debt or obligation due from Stier to the McWilliam estate. What in fact the appellant insists upon is that Stier, being the agent for the plaintiff and having money in his hands which was realized from the sale of the real estate, should have applied what was due to the McWilliam estate to the payment of the notes; or, differently expressed, that the plaintiff, being chargeable with the same notice and knowledge that her attorney and agent had, which included the fact that Rasines was an accommodation maker and, therefore, a mere surety, must be regarded as holding the McWilliam real estate interest in equity as collateral to the notes, whether that interest was in Mr. Dayton's, Mr. Stier's or her own hands, and, therefore, the proceeds of the interest should have been used to the extinguishment of the notes.

It will be noticed that no claim is made of any agreement to consider the real estate as collateral to the notes, but only that, being chargeable with the fact that the defendant was but a surety, the

plaintiff was bound in equity to apply the McWilliam interest to the payment of the notes ; and, not having done so, should not now be permitted to recover as against this defendant.

It is a little difficult to follow the reasoning upon which the appellant attempts to sustain this contention, for the notes sued on are payable " on demand and on return of the securities given," and, as urged by the respondent, there was no agreement to use the notes, and she could not be guilty of any wrong in not using them, as an offset to her attorney's obligation to the executors of McWilliam to pay over a certain sum when realized from a sale of the real estate. To sustain the defense that a creditor, as between a surety and the principal debtor, must resort first to the property of the principal debtor, two things are necessary — a request by the surety to the creditor so to proceed; and a failure to comply therewith, with resultant damage. (*Pain* v. *Packard*, 13 Johns. 174 ; *King* v. *Baldwin*, 17 id. 384 ; *Remsen* v. *Beekman*, 25 N. Y. 552.)

The defendant does not claim to have made any request, or even to have known, till after McWilliam's death, of the arrangement about the real estate, or of the transfer of the obligation of Stier to Dayton, and afterwards to McWilliam's executors. Even had the defendant known and made the request, it is doubtful, if, while the relations of the parties were such as there stated, the real estate interest represented by Stier's obligation to the executors could have been retained, appropriated or applied in payment of the notes. Seemingly, the executors were entitled to receive the money from Stier when the land was sold, and whatever debt the latter might have against the estate would be subject to presentation and payment in the regular course of administration. In other words, whilst Stier's obligation was one running personally in favor of the executors, plaintiff's claim on the notes as against McWilliam was a claim against the estate.

It is, however, unnecessary to determine that question, because the money was paid by Stier to the executor of McWilliam before any request had been made to apply it on the notes. We are aware of no rule in equity which would require the plaintiff, assuming, as we have done throughout this discussion, that she was chargeable with the knowledge that her agent Stier had, to seize and appropriate the moneys due to the executors of McWilliam in payment

of the debt due by defendant on the notes.    The notes and the real estate were two separate and distinct transactions.    The notes had specific collateral, and as the defendant had no relation to the real estate transaction, and did not sign the notes in reliance thereon or on the faith thereof, it is difficult to understand how, upon any theory in law or equity, he is entitled to any benefit from the real estate transaction.

We think that the disposition made of the case at the trial was right, and the judgment should be affirmed, with costs.

Van Brunt, P. J., Patterson, Ingraham and McLaughlin, JJ., concurred.

Judgment affirmed, with costs.